Janet MADDOCKS and Georgia McLaugh-
lin, d/b/a Anchorage Hotel Beauty
Salon, Appellants,

v.

Ida Jane BENNETT, Appellee.

No. 1006.

Supreme Court of Alaska.

July 9, 1969.

Charles W. Hagans, Hagans & Opland,
Anchorage, for appellants; James K. Sing-
leton, Anchorage, of counsel.

James N. Wanamaker, Wanamaker & Dickson, Anchorage, for appellee.

Before NESBETT, C. J., and DIMOND, RABINOWITZ, BONEY and CONNOR, JJ.

BONEY, Justice.

Appellants have appealed from an adverse jury verdict rendered in a personal injury suit.

Plaintiff, Mrs. Bennett, went to defendant Anchorage Hotel Beauty Salon at 5 p. m., on May 17, 1966, to have her hair dyed. She requested that a Lady Clairol product "Loving Care," be used; and defendant Janet Maddocks, a beauty operator, applied the dye to Mrs. Bennett. A patch test, a means of determining whether one is allergic to the dye, was not given to Mrs. Bennett, although such a test was required by the manufacturer's instructions 24 hours before each application of the dye. All parties agree that the failure to give the test was negligent. Subsequently, all of Mrs. Bennett's hair fell out. Mrs. Bennett claimed the dye caused the loss of hair, filed suit, and recovered a $7,200 verdict. On appeal, appellants question the admissibility of the deposition testimony of Doctor Baker, appellee's medical expert. They assert that Doctor Baker's testimony (a) was predicated in part on a concededly erroneous statement of fact contained in a hypothetical question and (b) may not have attained the required degree of medical certainty. Appellants also question the sufficiency of the evidence concerning causation.

In his deposition, Doctor Baker was asked a lengthy hypothetical question by counsel for appellee; this question covers several pages in the transcript. One of the assumptions stated in the question was the following:

[F]urther assume that *on the evening of the treatment* Mrs. Bennett notices a burning sensation on her face and a tingling sensation on the scalp.

This assumption was admitted to be unsupported by any evidence. What was shown in Mrs. Bennett's direct testimony was that the evening after the evening of the treatment Mrs. Bennett noticed her face was mottled, and that she had felt tired all day. The next morning she felt a burning sensation on her face. Her eyes were swollen, her scalp itched, and she experienced nausea, diarrhea and a headache. There were two other sources of information available to the jury concerning Mrs. Bennett's reactions: the histories of complaints given by her to her treating physicians Doctors Wilson and Dunn. Doctor Wilson testfied that plaintiff told him that the day following the application of the dye "she felt chilly, ill, had some diarrhea, had some itching on her body and her scalp and her arms * * *" Doctor Dunn stated that plaintiff told her that the next day there was a burning sensation on the scalp with some reddening, sore throat, and general feeling of ill health. The histories given to these doctors were taken close in time (several weeks) to the events in question.

The trial court recognized that the hypothetical contained an unsupported assumption. At the end of plaintiff's case, the court warned the jury specifically to consider the effect of the false assumption; and the court issued a cautionary instruction at the end of the case. It was the trial court's opinion that the unsupported assumption was not material enough to invalidate the entire opinion of the doctor, but would only affect the weight which should be accorded the opinion.

This court in Crawford v. Rogers, 406 P.2d 189, 192 (Alaska 1965) took a liberal view toward the admissibility of expert opinion. In *Crawford* the court was dealing with the question of whether the expert had sufficient facts at his disposal to render an opinion and whether the facts had to be listed as assumptions in a hypothetical question. The issue of an unsupported assumption in a hypothetical question was not raised in *Crawford*. This court had occasion to follow *Crawford* in the case of West v. Administratrix of Estate of Nershak, 440 P.2d 119 (Alaska 1968). In *Nershak,* this court upheld the admissibility of

a medical expert's opinion which was based on a hypothetical question.[1] The doctor stated that the cause of death was a beating given deceased by West, although the doctor stated his autopsy did not reveal a specific cause of death. Appellant had argued that since the autopsy did not show a specific cause of death, the doctor's opinion could not have been supported by sufficient facts. This court cited *Crawford* for the proposition that a jury should normally be the one to determine if an expert's opinion is based on sufficient facts, and that

> [I]f the trial judge felt that the jury could receive appreciable assistance from the opinion of the expert witness, this court would not interfere with his exercise of discretion in allowing the testimony to go to the jury, in the absence of an abuse.

*West* at 121. The *West* case, like *Crawford,* did not deal with a hypothetical containing a false assumption.

In Zerbinos v. Lewis, 394 P.2d 886 (Alaska 1964) this court did consider the situation of a hypothetical question containing an unsupported assumption. In *Zerbinos,* the unsupported assumption was later shown to be true; however, this court held it was permissible for the trial court to exclude the question until all the facts were in evidence which would go into the hypothetical. The hypothetical question was never reasked in *Zerbinos.* That case predates *Crawford* and *Nershak,* and is distinguishable from them. This court in *Zerbinos* briefly discussed the legal issues concerning hypothetical questions by stating that "the facts upon which a hypothetical question is based must be proved" either before or after the question is introduced.[2] There was no discussion of material as opposed to immaterial facts. There was no occasion for extended discussion by this

court in *Zerbinos* because of the importance of the unsupported fact. The hypothetical question in *Zerbinos* can be summarized as follows: (1) assuming a prior spinal pathology of a given kind (this was shown); (2) assuming the *accident in question* caused what has been diagnosed as acute cervical sprain (this part was not shown); (3) would the sprain aggravate the original pathology? The entire question revolved around the unsupported assumption that the accident caused a sprain.

Although the rule is often stated that a hypothetical question must not contain unsupported facts,[3] probably a majority of courts recognize that strict adherence to the rule would be impractical and pointless. An important case of this viewpoint is Treadwell v. Nickel, 194 Cal. 243, 228 P. 25, 34 (1924).

> The opinion can have little, if any, value unless the material facts assumed in such question are substantially true, and the court may properly so instruct the jury whenever there is conflicting evidence as to the truth of the assumed facts. Such opinion evidence does not, however, necessarily become wholly valueless because there is some variance between the facts assumed in the question and the factual facts proven. What weight should be given in such cases to the opinion of the expert witnesses is a question for the jury under proper instructions from the court.

In *Treadwell* the California court held proper the refusal to give an instruction which stated that the jury should disregard an expert's opinion if any material fact upon which he based his opinion was untrue.[4]

California courts have adhered to the *Treadwell* doctrine; for example, Division of Labor Enforcement v. Gifford, 137 Cal.

---

1. In the Nershak opinion the text of the hypothetical question was not set out.

2. Zerbinos v. Lewis, 394 P.2d 886, 888 n. 1 (Alaska 1964).

3. 2 B. Jones, Evidence § 416 (5th ed. 1958); C. McCormick, Evidence § 14 (1954).

4. The case is briefly discussed in 23 Mich. L.Rev. 411 (1925).

App.2d 259, 290 P.2d 281, 286 (1955) where it was stated

> [M]inor variances between the facts assumed and the facts in evidence do not render the question incompetent.

In the *Gifford* case the plaintiff had died of kidney failure due to long standing high blood pressure. The hypothetical assumed that 8 months before his final hospitalization, Gifford had been hospitalized and "had a blood pressure of 250 to 280 for a period of four weeks." The evidence showed that his blood pressure was 250 to 280 when he entered the hospital, but there was no evidence as to what it was during the four weeks he stayed in the hospital. This the court held to be a minor variance.

Another helpful case on this point is Culver v. Sekulich, 80 Wyo. 437, 344 P.2d 146, 151 (1959). In *Culver* the court carefully reviewed the hypothetical questions and concluded that there was some evidence to support every hypothetical question though not every statement in every hypothetical was supported by evidence. There was in general "a fair climate for the consideration of the views of the expert witnesses." In this case the questions had assumed exact times and distances as to when and for how long an airplane had been attempting to land in a snowstorm; the testimony had been vague but generally supported the question in that the plane had been very low and was heard for half an hour.

One test which appears very often is that the unsupported fact must be "material."[5] 2 J. Wigmore, Evidence § 680 at 799–800 (3d ed. 1940) states that to render the subsequent opinion inadmissible, the unsupported fact must be "important" and not merely a "trifling."

■ In summary some courts openly allow discretion to the trial judge to allow hypotheticals with immaterial variances to go to the jury. Most courts state that the facts in a hypothetical question must be supported by some evidence, but they usually mean the material facts. We believe that consistent with the liberal attitude toward expert opinion and hypothetical questions which this court has already adopted, the appropriate procedure is to allow immaterial variances to go to the jury with the appropriate cautionary instructions. This view is consistent with the facts of the *Zerbinos* case, which did not present the opportunity to adopt the above rule, because the unsupported fact was the crux of the hypothetical question.

■ Furthermore it is our opinion that the trial judge in this case was not mistaken in finding the variance immaterial. In the present case after the hypothetical question was answered, Doctor Baker testified that most probably an allergy caused the hair loss, and he then stated, "The only other possibility would be coincidence in that her hair would have fallen out anyway, which I would have found highly unlikely." We believe that this statement supports the inference that the doctor's analysis was based in part on a process of elimination; the cause of the hair loss was the allergic reaction because no other explanation seemed reasonable to him. Thus, it is likely that Doctor Baker would not have considered the unsupported fact material to his opinion.

Appellants have asserted as a second error the trial court's decision to allow Doctor Baker's testimony to go to the jury; appellants claim the testimony lacked the required degree of certainty. In response to this allegation, appellee claims (1) appellants waived this point because their brief does not comply with Supreme Court Rule 11(a) (6);[6] (2) appellants waived this point by introducing part of

---

5. Grand Island Grain Co. v. Roush Mobile Home Sales, Inc., 391 F.2d 35, 41 (8th Cir. 1968); Mercer v. Department of Labor & Indus., Wash., 442 P.2d 1000, 1002 (1968).

6. Sup.Ct.R. 11(a) (6) states that briefs shall contain
   A specification of errors relied upon which shall be numbered and shall set out separately and particularly each er-

the doctor's testimony themselves; (3) appellants waived this point because the testimony was not objected to at the pretrial deposition; (4) the trial court properly admitted the testimony. It is only necessary to consider the first and fourth points, the first because it relates to this court's rules and the fourth because it is decisive.

■ Appellee's claim that appellants failed to comply with Supreme Court Rule 11(a) (6) is rejected. Appellee claims that nowhere in appellants' brief do appellants set forth the full substance of the evidence erroneously admitted and the grounds of objection urged at trial. Both of these requirements are contained in Rule 11(a) (6). However, appellants' specification of error 3 does set out the parts of Doctor Baker's testimony in which he gives his opinion. The quoted opinion is appropriately cited to the transcript. Appellants quote their objection made during the trial, and this objection contains the reason urged for exclusion of the testimony, i. e., that the opinion was pure speculation not reaching the certainty required of a medical opinion. Appellants even quote the trial court's reasoning in overruling the objection. It is clear from their specification of error that they objected to all of Doctor Baker's testimony at trial and on appeal. Furthermore, the grounds for the objection are the same on appeal as they were at trial. Certainly appellants have more than complied with the requirements of the rule.

The fourth point of appellee obviates the other points on waiver. It seems clear that Doctor Baker's testimony was certain enough and therefore properly admitted. Appellants argue that this court has adopted the standard of "reasonable medical certainty" as the measure of proof of causal connection required in those cases where expert medical opinion is required. Appel-

lants appear to argue that certainty is more than probability. Appellants do not point to any particular portion of Doctor Baker's testimony which is uncertain.

This court has not had occasion to specifically rule on the degree of certainty required in a medical expert's opinion. However, this court has ruled on the amount of medical proof required to sustain damage awards. In the present case since the testimony of Doctor Baker was appellee's entire case as to medical causation, the standards should be the same. In Saslow v. Rexford, 395 P.2d 36, 41 (Alaska 1964) this court took the position that damages must be shown to be reasonably certain to be permanent or in their duration if not permanent. Although not stated expressly, this court in *Saslow* cited with approval the Restatement of Torts § 912, comment e (1939) which speaks in terms of "probabilities." The issue in *Saslow* was whether "possibilities" could be admitted. The court decided possibilities were admissible if there was other evidence showing reasonable certainty.

In City of Fairbanks v. Nesbett, 432 P.2d 607, 618 (Alaska 1967), as dictum, the standard of reasonable certainty of damages was again approved. Then in Beaulieu v. Elliott, 434 P.2d 665, 675 (Alaska 1967) this court held

> The trial court found that it was a reasonable medical probability that Elliott's condition, * * * would continue for the remainder of his life. * * * Such a finding, in turn, justifies the court's conclusion that Elliott should be awarded damages for pain and suffering for the remainder of his life.

This court in the past has equated reasonable certainty with reasonable probability.

This view point is widely accepted. In Crawford v. Seufert, 236 Or. 369, 388 P.2d

---

ror intended to be urged. When the error alleged is to the admission or rejection of evidence, the specification shall quote the grounds urged at the trial for the objection and the full substance of

the evidence admitted or rejected, and refer to the page number in the transcript as contained in the record on appeal where the same may be found. * * *

456, 459, 2 A.L.R.3d 354 (1964)[7] the Oregon court stated

> For medical opinion testimony to have any probative value, it must at least advise the jury that the inference drawn by the doctor is more probably correct than incorrect. If the probabilities are in balance, the matter is left to speculation.

The Supreme Court of Washington has upheld the following medical opinion as meeting the standard of certainty:

> My opinion is that as a result of her trauma she *probably* suffered a contusion, and she *possibly* has a post-traumatic syndrome due to the spasm of the muscles in the cervical area and it aggravates this headache; more or less keeps it as a source of irritation to her.

Clevenger v. Fonseca, 55 Wash.2d 25, 345 P.2d 1098, 1103–1104 (1959) (emphasis supplied).

■ Judged by the standards set out, Doctor Baker's testimony met the required degree of certainty. In answer to the long hypothetical question, he stated "with reasonable probability her reaction most likely could be an allergy or hypersensitivity reaction to some substance applied to her hair."

Q Now, Doctor, I would ask you further, assuming the assumptions I have given you, as to whether you could form an opinion with reasonable medical certainty as to whether or not the loss of hair in respect to Mrs. Bennett was caused by the hair dye application.

&ast; &ast; &ast; &ast; &ast; &ast;

A Yes.

Q Could you give us that opinion, Doctor?

A I think that the loss of hair could have been caused by whatever substance was applied to her hair at the beauty parlor.

&ast; &ast; &ast; &ast; &ast; &ast;

(The following is direct examination offered by defense.)

Q Do you have an opinion, Doctor, based on reasonable medical certainty on more probable than not basis, as to whether or not the hair loss was caused by the hair dye application?

A I would feel on the basis of probability that there is a reasonable probability that the application might have been a cause.

The trial court was of the opinion that Doctor Baker's testimony did meet the required test of certainty. The trial court denied the motion to strike the doctor's testimony for this reason and because the court felt the objection was waived because it was not made at the time of the deposition in order to give counsel a chance to obviate the difficulty. Since it appears that the testimony was sufficiently certain, and the trial court's ruling was not in error, there is no need to decide the questions of waiver.

As a third point, appellants raise several interesting questions about who has the burden of proving the causal relation between a negligent failure to act and the resulting damages, and how it should be proved by whoever has to prove it.

Appellee argues that appellants took a negligent risk by failing to patch test before dying Mrs. Bennett's hair. The application of the dye caused the hair loss due to an allergic reaction which was the combined result of the dye and the level of appellee's antibodies which had been created by prior contact with the product. Appellee claims to have made a prima facie case by showing that the dye caused the damage and that the failure to patch test was negligent. Appellee claims it was up to appellants to show, if they could, that if a patch test had been done, the results within the 24 hour period required by the manu-

---

7. *Accord,* Town & Country Sec. Co. v. Place, 79 Ariz. 122, 285 P.2d 165, 167 (1955); Rocky Mt. Trucking Co. v. Taylor, 79 Wyo. 461, 335 P.2d 448, 452 (1959).

facturer would have been negative and thus the dye would have been applied anyway. That is, it was the obligation of appellants to negate the causal connection between the negligent failure to act and the damages. As a second argument appellee claims that there was sufficient evidence to conclude that if the patch test had been done it would have prevented the damage by alerting appellants within 24 hours to the possibility of an allergic reaction.

Appellants admit that the failure to patch test was a negligent act. However, they deny that the evidence showed that the dye caused the hair loss. (Since Doctor Baker's testimony is admissible, this point is without merit in our opinion.) Appellants strongly contend that the burden was on appellee to show that had a patch test been done it would have been effective in preventing the damages. Appellants further contend that appellee failed in this showing.

According to conventional thinking, a plaintiff must prove every element in his case including the causal relationship between the negligent act and the injury.

> Where the act is the failure merely of a legal duty, causation is established only when the doing of the act would have prevented the result; if the result would have happened just as it did whether the alleged actor had done his duty or not the failure to perform the duty was not a factor in the result, or, in other words, did not cause it.

J. Beale, The Proximate Consequences of an Act, 33 Harv.L.Rev. 633, 637 (1920) quoted in Loibl v. Niemi, 214 Or. 172, 327 P.2d 786, 789 (1958). In Sowles v. Moore, 65 Vt. 322, 26 A. 629 (1893) (cited by W. Prosser, Torts § 41 n. 11 [3d ed. 1964]) the plaintiff's horses were frightened and ran into an opening in a frozen lake. The opening was not guarded or barricaded by defendant who had created the opening. The court stated

> The fact whether such a fence would have prevented the occurrence of the injury may be a difficult one for the jury to find, but *the burden is on the plaintiff* to show this * * *

26 A. at 630 (emphasis added). In Ford v. Trident Fisheries Co., 232 Mass. 400, 122 N.E. 389 (1919) plaintiff failed to prove cause in fact because there was no evidence that failure to properly lash a small boat to the deck of a ship contributed to the drowning of a seaman who sank without a trace immediately upon falling overboard.[8]

Appellee argues that the case is analogous to a res ipsa loquitur case, and appellee cites Weiss v. Axler, 137 Colo. 544, 328 P.2d 88 (1958) for support. Perhaps the present case could have been a proper case for the application of the doctrine of res ipsa loquitur. Appellee could have merely shown that she went to appellant's beauty salon, had her hair dyed, and suffered total loss of hair due to the dye. Then by showing that the dying process was in the control of appellants and that loss of hair doesn't ordinarily occur without negligence, a res ipsa loquitur case might have been established. Then it would have been up to appellants to show that all the procedures and materials used in dying were proper and that any failure to exercise due care (patch test) would not have prevented the occurrence.[9] However, the present case was tried on count I of the amended complaint, which is a detailed and direct claim of negligence on the part of appellants in failing to administer the patch test. In the pleadings and at trial the theory of res ipsa loquitur was not mentioned.

In arguing the case to this court, appellee states that a primia facie case was made out by showing that the dye caused the hair loss and that it was a negligent risk to fail to give the patch test. This theory is un-

---

8. *Accord*, Gutman v. Bronx Borough Bank, 188 App.Div. 664, 177 N.Y.S. 173 (1919); Loibl v. Niemi, 214 Or. 172, 327 P.2d 786, 789 (1958).

9. Richards v. Oregon Short Line R. Co., 41 Utah 99, 123 P. 933, 937 (1912); W. Prosser, Torts § 40 n. 68 (3d ed. 1964).

acceptable. Either the case is one of simple negligence and the specific negligent act or omission must be connected causally to the damage, or it is a res ipsa loquitur case, in which it is not necessary to establish the precise act or omission constituting negligence. Rather, it is shown that the fact of injury caused by the hair dye ordinarily does not occur without negligence. In Weiss v. Axler, *supra*, the plaintiff pleaded both theories, and the jury was instructed on the doctrine of res ipsa loquitur. For that reason, the Colorado court held the allegations of specific negligence did not preclude proof of general negligence.[10] However, in the present case only the claim of specific negligence was before the court and jury.

Even less applicable to the present case than res ipsa loquitur is appellee's analogy to violation-of-statute cases, e. g., Rogers v. Dubiel, 373 P.2d 295 (Alaska 1962). These cases are only concerned with the negligence of the act and not with causation in fact.

> The omission of a trafffic signal to an automobile driver who could not have seen it if it had been given is not a cause of the ensuing collision.

W. Prosser, Torts § 41 at 242 (3d ed. 1964). In Peterson v. Nielsen, 9 Utah 2d 302, 343 P.2d 731, 734 (1959), plaintiff was travelling at an illegally excessive speed, but even if she had been going a lawful speed she could not have avoided the accident. Therefore her contributory negligence (established by showing a violation of a statute) was not a cause of the accident. In Waugh v. Suburban Club Ginger Ale Co., 83 U.S.App.D.C. 226, 167 F.2d 758 (1948), a truck driver failed to signal for a turn, but there was no evidence the signal would have been seen by the plaintiff who was riding a bicycle. The court found no causal relationship between the violation by plaintiff and the injury. Violation of statute

cases really have nothing to do with causation. As the cases above show, a violation of a statute only determines if the actor's conduct is negligent. A reasonable man is presumed to be a lawful one. Whether the unlawful and hence negligent actions cause the damage is a separate inquiry.

In summary, because omitting the patch test was the specific negligent omission complained of, the burden was on appellee to prove that the omitted test if it had been performed would have prevented the hair loss. Had appellee chosen to plead and try the case on a res ipsa loquitur theory, this conclusion might have been different.

To prove cause in fact, appellee had to show the truth of the following statement: if the patch test had been given, results would have occurred within the 24 hour waiting period indicating an allergic reaction. The question which arises first is what are legitimate ways to prove the truth of this kind of statement.[11] The criterion of truth must be set up in face of the fact that this type of statement by its nature can never be subjected to any direct empirical test. Appellants suggest that appellee could have proved the truth of the above statement by taking a patch test before trial. This is erroneous. Appellee's level of antibodies was necessarily different after the full application of the dye. Such a test before trial might not be totally irrelevant, but it would not have proved anything. Appellants also claim that the only other "proof" was the actual results of the dye, and these results show a reaction 4 hours after the 24 hour period required by the manufacturer. Again this is not proof. Appellee correctly points out that a patch test would have been conducted on a different part of the body where the skin would be thinner. Of course, one would be looking for results of a test as opposed to "noticing" by chance the results of a hair dye *29* hours later.

---

10. *See* Crawford v. Rogers, 406 P.2d 189, 193 (Alaska 1965) (dictum).

11. This type of statement is a counterfactual conditional statement, i. e., it is conditional in form and runs counter to fact. N. Goodman, Fact, Fiction & Forecast 13 (1955).

Thus in spite of appellants' claims, there was no empirical way to actually test the conditional statement, i. e., that if a patch test had been given, it would have been effective.

The way in which such a statement is proved is by reference to scientific laws. For example, if it is an empirical law that matches under certain conditions ordinarily will light, then to prove that "this match if it had been struck would have lighted," one should prove that it is an ordinary match and the relevant circumstances were such that matches ordinarily light when struck.

Appellee did use the above method to try to prove her case. There was evidence from Doctors Dunn, Loomis, and Wilson that patch testing is generally very effective on people who have antibodies to the tested material. Referring to the above analysis, appellee tried to establish as an empirical law that patch tests on allergic people produce results. Appellee then tried to establish that she was an allergic person. She showed prior contact with the dye, and Doctor Baker testified that probably the dye caused the hair loss through an allergic reaction. This was the major part of appellee's proof that a patch test would have been effective.

Appellants criticize this kind of proof, stating that because patch tests are not effective in every case, the argument fails. This is erroneous. It is more logical to reason that because patch tests are very often effective on allergic persons, and appellee was an allergic person, then *probably* the test would have been effective on appellee. Appellee need not establish certainty, only probability. For these reasons we believe that the inference appellee attempted to draw from the fact that patch testing is generally effective, should be considered a proper element of the proof that a patch test in this case would have prevented the hair loss. Strictly speaking it is the only possible way appellee could prove her case.

If a patch test taken just before trial had been positive, appellants could have objected because of the likelihood that the full application of the dye had made Mrs. Bennett much more reactive than before. If she had very positive results from the full application within the 24 hours, appellants could have claimed it was irrelevant due to the great difference in the amount of dye applied. Appellants would be right, but this illustrates the logic of our ruling in this instance.

It should be mentioned that there was some evidence that appellant was having some reaction on the day following the treament, thus within 24 hours. At the 29 hour point Mrs. Bennett said to her husband that she had felt funny all day. When she went to see Doctor Wilson a week after the dye application, she told him that the day after the application she felt "chilly, ill, had some diarrhea, had some itching on her body and her scalp and her arms but she also said that her arms had been itching some for three days previous to going to the hairdresser." On June 3, 1966, two and one-half weeks after the incident, Mrs. Bennett told Doctor Dunn that the day following the treatment there was a burning sensation on the scalp with some reddening and she felt very poorly, her throat was sore. She stated that she did not feel very well and that these symptoms lasted for about two days. "[D]uring that time she noted that her hair was falling out quite rapidly. * * *" It is uncontradicted that hair came out during the beauty treatment.

■ Thus viewing the evidence in the light most favorable to plaintiff, we find that a reasonable person could conclude that if a test had been performed, a reaction would have occurred within 24 hours.[12] Because a reasonable person could conclude that more likely than not the test would have shown some indication of an allergic reaction, appellee did establish cause in fact sufficiently to take the case to the jury.

The judgment below is affirmed.

12. Otis Elevator Co. v. McLaney, 406 P.2d 7, 10 (Alaska 1965).